## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Carmen Colon, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Chattem, Inc., and Boehringer Ingelheim Pharmaceuticals, Inc.,<br><br>     Defendants. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Carmen Colon ("Plaintiff") brings this class action lawsuit individually and on behalf of all others similarly situated against Defendants Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., Chattem, Inc. (collectively, "Sanofi" or the "Sanofi Defendants"), and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer") (collectively, "Defendants"), based upon her personal knowledge and investigation of counsel, and alleges as follows:

### NATURE OF THE ACTION

1. Defendants manufactured and sold Zantac, an over-the-counter ("OTC") medication containing the active ingredient ranitidine used to relieve the symptoms of heartburn, acid stomach, GERD and similar conditions. Zantac is available in 75 mg and 150 mg tablets (collectively, the "Zantac Products" or

"Zantac") and was sold to consumers through online channels and at brick and mortar stores and pharmacies. Defendants aggressively promoted Zantac as a safe and effective treatment for heartburn. Zantac products, however, are non-merchantable and not of the quality represented by Defendants.

2.      On September 13, 2019, the United States Food and Drug Administration ("FDA") issued a statement alerting patients and medical professionals that Zantac "contain[s] a nitrosamine impurity called N-nitrosodimethylamine ("NDMA")."[1]

3.      The FDA recommended that "[p]eople taking OTC ranitidine could consider using other OTC medicines approved for their condition. There are multiple drugs on the market that are approved for the same or similar uses."[2]

4.      NDMA is a known probable human carcinogen.[3]

5.      Zantac is a popular heartburn medication that was sold for OTC purchases since 1995.

---

[1] FDA Statement, "Statement alerting patients and health care professionals of NDMA found in samples of ranitidine," available at https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine. ("FDA Statement").

[2] FDA Statement.

[3] *See* U.S. National Library of Medicine, Medline Plus, Ranitidine, available at https://medlineplus.gov/druginfo/meds/a601106.html.

6.     Plaintiff purchased Zantac and stopped taking Zantac after she learned that Zantac exposed her to NDMA, a carcinogen, and that ingesting Zantac put her at increased risk of developing cancer.

7.     Following the FDA announcement, several manufacturers of ranitidine, the active ingredient in Zantac, issued voluntary recalls of their products containing ranitidine.

8.     On September 24, 2019, Sandoz recalled fourteen (14) lots of ranitidine because it found NDMA in the capsules.[4]

9.     Apotex Corp., another ranitidine manufacturer, recalled all of its ranitidine products, labeled by Walgreens, Walmart, and Rite-Aid, on September 26, 2019.[5]

10.    By September 30, 2019, CVS removed Zantac and generic ranitidine from CVS's shelves.[6]

---

[4] *See*, "FDA announces voluntary recall of Sandoz ranitidine capsules following detection of an impurity," September 24, 2019. https://www.fda.gov/news-events/press-announcements/fda-announces-voluntary-recall-sandoz-ranitidine-capsules-following-detection-impurity.

[5] "FDA alerts health care professionals and patients to voluntary recall of ranitidine medicines," available at https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine.

[6] "Drugstores are pulling Zantac-like heartburn drugs off the shelves over potential cancer risk," The Washington Post, September 30, 2019.

11.     Sanofi instituted a voluntary recall of its OTC Zantac in the United States and Canada on October 18, 2019.[7]

12.     Zantac is an $H_2$ receptor blocker which interferes with the production of acid in the in the stomach,[8] therefore relieving heartburn/acid indigestion and sour stomach. The active ingredient in Zantac is ranitidine.

13.     Hundreds of thousands of consumers purchased and used Zantac, believing that it was a safe medication that did not expose them to NDMA and put them at risk of developing cancer.

14.     Zantac, however, is defective.

15.     On September 9, 2019, Valisure LLC and ValisureRX LLC ("Valisure"), an online pharmacy and analytical laboratory registered with the International Organization for Standardization, the Drug Enforcement Agency, and the FDA, submitted a "Citizen Petition on Ranitidine" to the FDA to report that it had detected "extremely high levels of N-Nitrososdimethylamine [], a probable

---

[7] "Sanofi to Conduct Precautionary Voluntary Recall of Zantac OTC in U.S. and Canada," PRNewswire, available at http://www.news.sanofi.us/2019-10-18-Sanofi-to-conduct-precautionary-voluntary-recall-of-Zantac-OTC-in-U-S-and-Canada.

[8] *See* U.S. National Library of Medicine, Medline Plus, Ranitidine, available at https://medlineplus.gov/druginfo/meds/a601106.html.

human carcinogen" in every lot of Zantac and generic ranitidine it tested (the "Valisure Petition").[9]

16.    Valisure tested several lots of Zantac and generic ranitidine using FDA protocols and methodologies and conducted additional tests that mimic the normal temperature of the human body to avoid obtaining "extreme" results by testing Zantac under ordinary conditions.[10]

17.    These tests by Valisure detected levels of NDMA exposure from Zantac that greatly exceeded the FDA's recommended maximum daily intake.

18.    The FDA has set the maximum permissible daily intake of NDMA in pharmaceuticals at **96 ngs** (nanograms).[11]

19.    Valisure concluded that high levels of NDMA in Zantac "are likely due to an inherent instability of the ranitidine molecule itself" as "[t]he ranitidine molecule contains both a nitrite and a dimehyylamine ("DMA") group which are *well known to combine to form NDMA*."[12]

20.    Valisure found that Zantac formed extremely high levels of NDMA.[13]

---

[9] Valisure Petition at 1, 6.

[10] Valisure Petition at 6.

[11] Valisure Petition at 1, 3.

[12] Valisure Petition at 1 (emphasis added).

[13] Valisure Petition at 1.

21.    Consumers who take Zantac are exposed to NDMA in amounts that far exceed 96 ngs per day. Indeed, it was reported that just one 150 mg Zantac tablet forms approximately **26,000-34,000 times** the maximum recommended daily limit of NDMA, putting consumers at risk of cancer because they took Zantac.[14]

22.    Defendants never alerted consumers that they would be exposed to NDMA from Zantac, even though Defendants were aware of this fact and of scientific evidence documenting exposure to NDMA from Zantac and ranitidine products. The failure by Defendants to provide notice to consumers induced consumers to continue purchasing Zantac and add to Defendants' revenues, and keep consumers from switching to other widely available medications to treat their symptoms such as Tagamet, Pepcid, Prilosec, Nexium, Prevacid, Protonix, AcipHex, and Dexilant, that would not expose consumers to NDMA or increase their risk of cancer.[15]

23.    Defendants knowingly concealed from Plaintiff and Class members, as well as the FDA, material facts and represented that Zantac was of a certain standard and purity when it was not, deceiving the FDA, and inducing Plaintiff and Class members into purchasing Zantac and paying more for Zantac than it was worth.

---

[14] Valisure Petition at 6.

[15] Valisure Petition at 15.

24.    Plaintiff and Class members did not receive the benefit of their bargain and paid more than they would have, had they known that Zantac exposed them to NDMA and put them at risk for cancer.

25.    Had Plaintiff and Class members known that Zantac "would react with itself", "produce NDMA", and expose them to as much as 26,000-34,000 times more than the recommended daily limit of the probable human carcinogen NDMA, they would have paid less for Zantac, or not purchased Zantac at all, and would have purchased one of many other readily available substitute medications. The FDA's prompt action to alert the public to the dangers associated with Zantac once it became aware of the truth about Zantac, and the prompt recall of Zantac following this announcement, demonstrates Zantac's diminished value.

26.    Defendants earned many millions of dollars from their sale of Zantac at the expense of Plaintiff and Class members who unwittingly purchased Zantac, not knowing that it would expose them to excessive levels of NDMA that put them at greater risk of developing cancer. Plaintiff and the Class members now seek to recover their economic losses, statutory damages, and other available remedies as a result of their purchase of Zantac.

## **PARTIES**

### **A. Plaintiff Carmen Colon**

27.    Carmen Colon is a citizen of New York residing in Bronx, New York.

28.     Ms. Colon used Zantac for approximately ten (10) years to relieve heartburn and related gastrointestinal symptoms.

29.     Ms. Colon paid $24.99 for 140 tablets of Zantac from BJ's on June 24, 2019 and on other occasions. At times, she also purchased Zantac from other pharmacies or retail establishments. Plaintiff Colon recalls purchasing Zantac from Target for approximately $32.99.[16]

30.     Ms. Colon also paid for Zantac that she cannot use now that she is aware of the risk of excessive NDMA exposure from Zantac and the increased risk of cancer.[17]

31.     Ms. Colon estimates that she paid approximately $300-$400 per year for Zantac, totaling approximately $3,000-$4,000 since she began taking Zantac.

32.     Ms. Colon was diagnosed with colon cancer in 2013 which is currently in remission.

33.     Had Ms. Colon been informed that: (a) Zantac forms excessive levels of NDMA once ingested; (b) NDMA is a carcinogen; and (c) exposure to NDMA increases the risk of cancer, she would not have purchased Zantac and would have

---

[16] *See* Plaintiff Colon's June 24, 2019 receipt from BJ's for Zantac, 140 count, attached hereto as Exhibit A.

[17] *See* photo of unused Zantac Products provided by Plaintiff Colon, attached hereto as Exhibit B.

purchased one of many other readily available substitute medications. Zantac certainly was not worth the price she paid.

34.     Ms. Colon learned about the link between Zantac and NDMA from a news report on her local news station, Channel 2, New York (when it reported on the FDA's September 13, 2019 announcement), and immediately stopped taking Zantac when she learned of the excessive levels of NDMA and cancer risk.

**B. Defendants**

35.     Sanofi-Aventis U.S. LLC is a Delaware limited liability corporation with its principal place of business in Bridgewater, New Jersey. Sanofi-Aventis U.S. LLC is a wholly owned subsidiary of Sanofi, a French company.

36.     Sanofi US Services Inc. is a Delaware corporation with its principal place of business in Bridgewater, New Jersey. Sanofi US Services Inc. is a wholly owned subsidiary of Sanofi, a French company.

37.     Chattem, Inc. is a Tennessee Corporation with its principal place of business in Chattanooga, Tennessee. Chattem, Inc. is a wholly owned subsidiary of Sanofi, a French company.

38.     The Sanofi Defendants have manufactured Zantac and owned the United States rights to Zantac since January 2017.

39.     Boehringer Ingelheim Pharmaceuticals, Inc. is a Delaware corporation with its principal place of business in Ridgefield, CT. It is a subsidiary of Boehringer

Ingelheim, a German company. Boehringer owned the United States rights to Zantac from October 2006 to January 2017.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because at least one member of the proposed Class is of diverse citizenship from one defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs.

41.     This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in New Jersey and within this District and because the Sanofi Defendants' principal place of business is in this District. Defendants have sufficient minimum contacts with New Jersey and intentionally avail themselves of the consumers and markets within New Jersey through the promotion and sale of Zantac and other products.

42.     Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the acts giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background Regarding Zantac

43.     Zantac is a heartburn medication that "is clinically proven to relieve heart burn in as little as 30 minutes."[18]

44.     Some form of Zantac has been on the market since 1981. Glaxo (now GlaxoSmithKline) introduced Zantac to the market in 1981 and by 1988, Zantac had become the world's biggest selling prescription drug.[19]

45.     Zantac became available without a doctor's prescription in December 1995[20] and was widely used to treat heartburn and related conditions in both children and adults since it was first introduced.[21]

46.     Sanofi reported net U.S. sales of Zantac in the United States for 2018 as 113 million Euros (approximately $123 million using current exchange rates).[22]

---

[18]  *See* zantacotc.com, available at https://www.zantacotc.com/zantac-maximum-strength.html#learn-more.

[19] https://www.worldofmolecules.com/drugs/zantac.htm.

[20] The Spokesman-Review, December 20, 1995, https://www.spokesman.com/stories/1995/dec/20/zantac-will-be-sold-over-the-counter.

[21] Thomas, Katie, "*Should you Keep Taking Zantac for Your Heartburn*," The New York Times, September 19, 2019.

[22] Sanofi, Form 20-F, Annual Report Pursuant to Section 13 0r 15(d) of the Securities and Exchange Act of 1934 for the fiscal year ending December 31, 2018, 2018 Consumer Healthcare net sales by geographical regions, at 97.

47.     Defendants marketed Zantac as a safe medication for the treatment of heartburn and did not inform the FDA or warn consumers on its packaging or elsewhere that Zantac contains or creates within the person ingesting it, excessive levels of NDMA, a potent carcinogen that has been linked to cancer in animals and is listed as a probable human carcinogen by the FDA.

**B. NDMA Is A Carcinogen**

48.     Scientific and medical evidence has established the risk of NDMA exposure from Zantac.

49.     The FDA, the Environmental Protection Agency ("EPA"), the International Agency for Research on Cancer ("IARC"), and the World Health Organization ("WHO") have long concluded that NDMA is a probable human carcinogen.

50.     The WHO and the IARC have included NDMA on their list of probable human carcinogens since 1987.[23]

---

[23] IARC Monographs on the Identification of Carcinogenic Hazards to Humans (1987), Vol. 17, supp. 7, available at, https://monographs.iarc.fr/agents-classified-by-the-iarc/; *see also* American Cancer Society, "Known and Probable Human Carcinogen," available at https://www.cancer.org/cancer/cancer-causes/general-info/known-and-probable-human-carcinogens.html; World Health Organization, Guidelines for Drinking-Water Quality, 3rd edition including 1st and 2nd addenda, 2008.

51.     The FDA has also determined that NDMA is a dangerous substance and probable carcinogen, prompting it to recall many medications over the years after a finding that those medications contain NDMA at unhealthy levels, and the FDA actively investigates claims of NDMA in medications that it has approved for sale.[24]

52.     It is a generally accepted fact in the scientific community that NDMA is a dangerous carcinogen. Yale University and the University of California, Berkeley describe NDMA as a "member of a family of extremely potent carcinogens."[25]

**C. Valisure Confirmed High Levels Of NDMA Formation From Zantac**

53.     Valisure detected "significant NDMA formation" from Zantac when it conducted its tests described above.[26]

54.     Valisure found that *every dose* and *every form* of Zantac and ranitidine it tested formed excessive amounts of NDMA.

55.     Three of the samples that Valisure tested were Defendants' Zantac Products: Zantac, Brand OTC, Zantac (mint), Brand OTC and Zantac (mint) CVS.[27]

---

[24] *See* FDA Statement.

[25] Mitch, William A., *et al.*, "*N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*," Environmental Engineering Science, Vol 20, No. 5, 2003 ("2003 NDMA Review").

[26] Valisure Petition at 7.

[27] Valisure Petition at 6.

13

These samples formed extraordinarily high levels of NDMA under biologically relevant conditions, 2,511,469, 2,834,798 and 3,267,968 ngs, respectively.

56.     Valisure found that the source of the NDMA is the ranitidine itself, concluding that "Valisure's testing reveals NDMA levels so high that the nitroso for NDMA likely comes from *no other source than the ranitidine molecule itself*."[28]

### D. Defendants Concealed The Risks Of NDMA Exposure From Zantac

57.     Defendants have known or should have known of the link between Zantac/ranitidine and NDMA – which has been reported in the scientific literature for years – but failed to report this link to the FDA or to consumers.

58.     Valisure, not Defendants, reported in its Citizen Petition to the FDA that the ranitidine molecule is unstable and reacts with itself to from NDMA and reported that "combined with other data from Valisure and the scientific works of Stanford University and others, the evidence presented shows this instability and the resulting NDMA occurs in the conditions representative of those in the human body."[29]

59.     Scientists have been investigating the link between Zantac (ranitidine) and NDMA for years.

---

[28] Valisure Petition at 5 (emphasis added).

[29] Valisure Petition at 2.

60.     In one study, researchers concluded that ranitidine has "caused much concern" as a potent NDMA precursor."[30]

61.     Valisure charted the history of research linking Zantac/ranitidine and NDMA in its Citizen Petition as follows:[31]

## Ranitidine Investigation Summary

**PILL** ➡ **BODY** ➡ **WASTE** ＝ **CANCER**

| | | | |
|---|---|---|---|
| Ranitidine is unstable and can form millions of ng of NDMA* | Ranitidine likely generates millions of ng of NDMA in humans | >40,000 ng of NDMA found in urine after taking ranitidine pills | Evidence in NCI study linking ranitidine to cancer |

**1980s** – Ranitidine suspected of reacting with nitrite in the stomach to form NDMA.

**2000s** – Studies show instability of ranitidine and its DMA group is linked to forming NDMA in oxidative conditions.

**2019** – Valisure shows ranitidine forms millions of ng of NDMA and can react with itself. Both DMA and nitrite (N) are present in ranitidine.

**1980s** – Ranitidine shown to form thousands of ng of NDMA in conditions of the human stomach.

**2016** – Stanford study suspects millions of ng of NDMA formed by ranitidine separately from the stomach, but mechanism unknown.

**2019** – Valisure identifies and models DDAH-1 enzyme revealing potential mechanism for generating millions of ng of NDMA in body.

**2000s** – Urination of ranitidine into wastewater suspected as source of NDMA in municipal drinking water.

**2016** – Stanford University conducts clinical study with 10 healthy volunteers taking 150mg of ranitidine once per day. >40,000 ng of NDMA detected in urine. Suspected link to bladder cancer.

**2004** – National Cancer Institute study links antacids, ranitidine and cimetidine, to bladder cancer.

**2019** – Valisure working with Memorial Sloan Kettering Cancer Center on epidemiological studies specific to ranitidine.









*The FDA maximum permissible daily exposure of the probable human carcinogen, NDMA, in pharmaceuticals is 96 ng



---

[30] Liu, Yond Dong, *et al.*, "*Formation Mechanisms of NDMA from Ranitidine, Trimethylamine, and Other Tertiary Amines during Chloramination: a computational study*," published online June 26, 2014, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4123930/.

[31] "Ranitidine Investigation Summary available at https://www.valisure.com/blog/uncategorized/detection-of-ndma-in-raniditine/.

62.     In a 2003 article, researchers posited that the increasing presence of NDMA in water could be attributed to "drugs such as ranitidine" as well as other industrial contaminants.[32]

63.     In 2016, Professors Teng Zeng (Department of Civil and Environmental Engineering, Syracuse University) and William Mitch (Department of Civil and Environmental Engineering, Stanford University) tested the effects of ranitidine in the human body. Mitch showed that when people took Zantac 150 mg tablets test subjects excreted large amounts of NDMA in their urine, "roughly 400 times elevated amounts of NDMA in their urine (over 40,000 ngs)."[33] These researchers concluded that the test subjects' exposure to NDMA from Zantac is likely much higher than the amount excreted in the urine because NDMA has "a high metabolic conversion rate" such that only a small percentage of NDMA in the body is excreted in the urine.[34]

---

[32] 2003 NDMA Review, 395-6.

[33] Valisure Petition at 11.

[34] Zeng, Teng and Mitch, William, "Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine," Carcinogenesis, Volume 37, Issue 6, June 16, 625-634, available at https://www.ncbi.nlm.nih.gov/pubmed/26992900 ("Zeng/Mitch 2016 Zantac Study").

64.     Zeng and Mitch concluded that there is a "need to evaluate the risks attributable to NDMA associated with chronic consumption of ranitidine, and to identify alternative treatments that minimize exposure to N-Nitrosamines."[35]

65.     Valisure also reported to the FDA that "Investigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of ranitidine use," due to the "known carcinogenic potential of NDMA" and the "widespread use" of ranitidine.[36]

66.     Defendants followed and were aware of the scientific research regarding Zantac and ranitidine.

67.     Despite the widespread scientific evidence of an association of ranitidine and NDMA, Defendants failed to inform or alert the FDA or consumers to the risk of exposure to NDMA from Zantac, even though the reported level of NDMA in Zantac is much higher than in Valsartan and other medicines in the same class that the FDA has investigated and which have been recalled.

68.     Defendants knew or should have known of the extraordinarily high levels of NDMA from Zantac.

---

[35] Zeng/Mitch 2016 Zantac Study, Abstract.

[36] Valisure Petition at 12.

69.     Defendants knew or should have known that "ranitidine has been implicated as a cause of NDMA formation by multiple research groups including those at Stanford University."[37]

70.     Defendants did not report relevant scientific data and reports identifying and discussing the links between Zantac and NDMA to the FDA as required, and also failed to provide notice of these facts to consumers.

71.     The Code of Federal Regulations establishes a procedure to not only ensure that drugs and medications are safe and effective before they are approved, but also to "establish an effective system for the FDA's surveillance of marketed drugs."[38]

72.     Manufacturers must submit an annual report to the FDA.[39]

73.     The annual report must include, *inter alia*, "[a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of

---

[37] Valisure Petition at 8.

[38] 21 C.F.R. § 314.2.

[39] 21 C.F.R. § 314.81(b)(2).

this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study."[40]

74.     The report must also include "[r]eports of experiences, investigations, studies, or tests involving chemical or physical properties, or any other properties of the drug" for "new information that may affect the FDA's previous conclusions about the safety or effectiveness of the drug product."[41]

75.     Significantly, manufacturers of an approved drug must also report "[n]onclinical laboratory studies" including "[c]opies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and in vitro studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the applicant concerning the ingredients in the drug product. The applicant shall submit a copy of a published report if requested by FDA."[42]

76.     Defendants failed to comply with these regulations and made material misrepresentations and omissions to the FDA. Defendants failed to submit supplements to the FDA providing the studies that reveal that Zantac and ranitidine

---

[40] 21 C.F.R. § 314.81(b)(2)(i).

[41] 21 C.F.R. § 314.81(b)(2)(iv)(a).

[42] 21 C.F.R. § 314.81(b)(2)(v).

contain the probable human carcinogen NDMA. Defendants further failed to make adequate disclosures to the FDA regarding the Zantac/ranitidine NDMA linkage.

77.     Defendants also failed to submit updated proposed labeling to the FDA warning consumers that Zantac contains NDMA, a probable human carcinogen.

78.     The FDA maintains an Index to Drug-Specific Information. The Index "only includes drugs that have been the subject of drug safety communication."[43] Zantac does not appear on this list, nor does ranitidine.

79.     Over the years, Defendants have submitted supplements to the FDA, largely reporting changes to package labeling for Zantac. These supplements failed to report potential safety concerns regarding the presence of NDMA resulting from use of Zantac and other ranitidine products, despite industry reports of the association of NDMA with Zantac and ranitidine.[44]

80.     Indeed, Valisure, not any of the Defendants, reported its safety concerns to the FDA and "urge[d] the Commissioner and the FDA to expeditiously request recalls of all ranitidine products to protect the American public from further

---

[43]     FDA "Index to Drug-Specific Information," available at https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/index-drug-specific-information.

[44]     Defendants Supplements to the FDA, available at https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo=021698.

exposure to the potentially carcinogenic properties of ranitidine, which is not labeled for such risk and in light of such risk, would not likely be acceptable for most, if not all, its intended treatments."[45]

81.     Defendants continued to manufacture and sell Zantac for years after the scientific literature revealed the link between Zantac and ranitidine/NDMA as described above, and failed to comply with FDA reporting requirements that are designed to protect the public and prevent consumers from being exposed to harmful substances.

82.     Defendants' failure to report to the FDA the facts about Zantac as set forth above harmed consumers, as consumers would not have purchased Zantac, are left with unused Zantac that they have paid for and will not use, and paid more for Zantac than the products were worth had the truth about the products been known.

83.     Defendants' lack of reporting also prevented the healthcare community and the public from timely learning of the risks associated with Zantac use which inevitably played a part in consumers' decision-making regarding OTC treatments for heartburn.

84.     Under applicable state and federal law, Defendants had a duty to report known safety issues to the FDA and had a duty to exercise reasonable care to

---

[45] Valisure Petition at 4.

adequately warn Plaintiff and Class members about the dangers of NDMA present in Zantac.

85.    Despite having knowledge that Zantac and ranitidine posed a hazard to the public, and placed consumers at risk of harm, Defendants did not identify, disclose, or warn of the health hazards associated with Zantac consumption.

86.    Defendants' failures as set forth above also left Plaintiff and Class members with unused Zantac. Plaintiff, who purchased Zantac at BJ's, paid approximately 18 cents per tablet and suffered damages equal to the amount they paid for unused Zantac.[46]

87.    Plaintiff and Class members paid more for Zantac Products than they would have had they known that Zantac is a dangerous, defective product that put them at greater risk for cancer, and/or would not have purchased Zantac at all had they known the truth about Zantac.

88.    Consumers regularly determine what they are willing to pay based on what the product's label states, paying more when a product has attributes they consider favorable, and less when they do not.

89.    For example, economists have studied consumer behavior to assess whether consumers will pay more for "organic" or "healthy" products. They have

---

[46] *See* Exhibit A.  Plaintiff Colon paid $24.99 for 140 Zantac tablets.

found that consumers do pay more for products with labels that include the terms healthy or organic.[47]

90.     Conversely, consumers pay less, or purchase alternatives, when a product label contains negative information. Economists regularly study what consumers are willing to pay for products based on product labeling and based on their perceptions of the product's safety and healthfulness.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this action individually and on behalf of the following class pursuant to FED. R. CIV. P. 23(a), (b)(2) and/or (b)(3).

> All persons in New York who purchased Zantac Products during the applicable statute of limitations (the "Class").

92.     Excluded from the Class are Defendants and their employees, officers and directors.

93.     Plaintiff reserves the right to expand or modify the Class definition based on facts learned during discovery prior to filing a motion for class certification.

94.     Numerosity: The members of the Class are so numerous that joinder of all members in one action is impracticable. Zantac products have been one of the most popular OTC medications for relief of heartburn and similar conditions. In

---

[47]*See* Harris, Michael J. "Consumers Pay a Premium for Organic Baby Foods," available at https://www.jstor.org/stable/40987236.

2018, Defendants' annual sales of Zantac exceeded 100 million dollars. The Class consists of thousands of members. The precise number of Class members is not known to Plaintiff at this time, but it will be possible to determine the Class size from the records of Defendants and retailers.

95.     Typicality: Plaintiff's claims are typical of all members of the Class as both Plaintiff and Class members purchased Zantac that exceeded the maximum recommended daily intake of NDMA and were harmed by Defendants' conduct.

96.     Adequacy: Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class she seeks to represent; she has retained counsel highly experienced in class action litigation involving defective products; and she is committed to vigorously prosecute this action. Plaintiff and her counsel will fairly and adequately prosecute the Class members' claims.

97.     Commonality and Predominance: Common questions of law and fact exist as to all members of the Class and in fact predominate over any questions affecting individual Class members, including, without limitation:

a.     Whether Zantac contained or exposed consumers to NDMA in amounts that far exceed the recommended daily intake of NDMA;

b.     Whether Defendants failed to report to the FDA that Zantac contained or exposed consumers to unsafe levels of NDMA;

24

c.      Whether Defendants' failure to make required disclosures to the FDA deprived the Class of material information regarding Zantac;

d.      Whether Defendants withheld material information from the Class regarding Zantac and Class members' exposure to NDMA;

e.      Whether Defendants failed to disclose material risks associated with taking Zantac;

f.      Whether Defendants engaged in unlawful, deceptive, and/or unfair acts;

g.      Whether Defendants were negligent;

h.      Whether Defendants' conduct harmed Plaintiff and Class members; and

i.      The appropriate measurement of damages and/or restitution to Plaintiff and Class members.

98.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of Plaintiff's and Class members' claims. The economic injury suffered by each Class members is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for individual Class members to obtain effective relief from Defendants' actions absent certification of a class action. Individual litigation of multiple cases would be highly

inefficient, a waste of judicial and party resources and the prosecution of separate actions by individual Class members would create a risk of inconsistent results. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each Class member's individual claim is small compared to the expense and burden of individual prosecution.

## TOLLING ALLEGATIONS

### The Discovery Rule

99.    Plaintiff and Class members could not have discovered with the exercise of reasonable diligence that Zantac exposed them to excessive levels of NDMA or that Defendants withheld relevant information regarding Zantac.

100.   Plaintiff and Class members did not discover and were unaware of the facts that would cause a reasonable consumer to suspect that Defendants withheld information relating to NDMA exposure from Zantac.

101.   Plaintiff and Class members had no reason to research the topic or have access to the scientific literature linking Zantac and NDMA exposure or have the background to understand the scientific literature relating to NDMA exposure.

102.   Plaintiff and Class members could not have discovered that Defendants withheld relevant information regarding the safety of Zantac until Valisure submitted its Citizen Petition to the FDA and following the FDA's September 13, 2019 announcement when Defendants' deception became known and reported.

103.   As such, application of the discovery rule tolls the statute of limitations.

**Fraudulent Concealment**

104.   Defendants' fraudulent concealment of the excessive levels of NDMA associated with Zantac also tolls the statutes of limitation applicable to Plaintiff and Class members' claims. Defendants failed to disclose the known link between Zantac and NDMA to Plaintiff and Class members, or the FDA, and continued to manufacture and sell Zantac and did not include this relevant information in its product labeling or elsewhere.

105.   Defendants' fraudulent concealment of the link between Zantac and excessive levels of NDMA exposure prevented Plaintiff and Class members from discovering the nature of their claims against Defendants.

**Estoppel**

106.   Defendants had a continuing duty to disclose to Plaintiff and Class members the risks attendant to taking Zantac, but knowingly, intentionally, and recklessly failed to take appropriate action to alert Plaintiff and Class members to the material risks of NDMA exposure from ranitidine.

107.   Defendants are therefore estopped from asserting any statutes of limitations as a defense in this matter.

**CAUSES OF ACTION**

**COUNT I**
**(New York Deceptive Acts and Practices Act)**

27

## N.Y. Gen. Bus. Law § 349
## (On Behalf of Plaintiff and the Class)

108.   Plaintiff hereby incorporates by reference all preceding allegations.

109.   Plaintiff and Class members are "persons" within the meaning of the New York Deceptive Acts and Practices Act ("NYDAPA"). NY GBL § 349(h).

110.   New York General Business Law ("NY GBL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in furnishing of any service in this state…." NY GBL § 349.

111.   Defendants engaged in deceptive acts and practices in connection with the sale of Zantac by, among other things, marketing and representing that Zantac was fit for its ordinary and intended purpose of safely and effectively treating heartburn, which it was not because of the excessive levels of NDMA exposure resulting from Zantac which put Plaintiff and Class members at risk of cancer. Defendants systematically misrepresented, concealed, suppressed, or omitted material facts relating to Zantac with the intent that consumers would rely upon such misrepresentations, concealment, suppression, or omission.

112.   Defendants' deceptive acts or practices occurred repeatedly in the course of their business, trade or commerce and were capable of deceiving a substantial portion of the purchasing public.

113.   Defendants affirmatively misrepresented to Plaintiff and the Class in advertising and other forms of communication, including standard and uniform

material provided with the drug's packaging, that the Zantac Products had no significant defects and were safe to consume, when in fact they were not. Accordingly, Defendants engaged in unfair and deceptive acts or practices.

114.   Defendants' failure to comply with their reporting obligations to the FDA deprived Plaintiff and the Class of material information relating to Zantac and concealed the dangers attendant to exposure to NDMA from Zantac from Plaintiff and the Class.

115.   Defendants knew or should have known that their acts, omissions, and conduct violated the NYDAPA because Zantac exposed consumers to NDMA and were therefore not suitable for their intended use.

116.   These acts and practices deceived Plaintiff and the Class, and are likely to, and did, deceive the public. In failing to disclose the risk of exposure to NDMA by taking Zantac and suppressing material facts from Plaintiff and the Class, Defendants violated NYDAPA and caused injuries to Plaintiff and the Class. The omissions and acts of concealment by Defendant pertained to information that was material to Plaintiff and the Class, as it would have been to all reasonable consumers.

117.   Defendants' acts and omissions were likely to mislead a reasonable consumer into purchasing Zantacs.

118.   Defendants' deceptive acts are material because they concern an essential feature of the Zantac Products – the ability to safely treat a variety of

gastrointestinal disorders by reducing the amount of acid that consumers' stomachs produce, when in fact, the excessive levels of NDMA from Zantac put Plaintiff and the Class at risk of cancer and led them to spend money on Zantac that they otherwise would not have spent on Zantac.

119.   Plaintiff   and   the   Class   reasonably   relied   on   Defendants' misrepresentations   and   omissions   of   material   facts   in   its   advertisements   and packaging when they purchased Zantac Products.

120.   At all times relevant hereto, Defendants' conduct in employing these unfair and deceptive trade practices was malicious, willful, wanton and outrageous.

121.   Plaintiff and the Class did not receive the benefit of their bargain.

122.   Plaintiff and the Class would have paid less for Zantac or not purchased it at all, would have purchased other available medications, and would not have paid for Zantac that they have not used and will not use, had they known that Zantac exposed them to excessive levels of NDMA and put them at risk of cancer.

123.   Plaintiff and the Class suffered a loss equal to the amount they paid for unused Zantac.

124.   Economists can quantify the price Plaintiff and reasonable consumers would have paid for Zantac, if indeed any price would have been paid, had they known its true risks. Any reasonable consumer would have considered the presence

of NDMA in Zantac coupled with the increased risk of cancer to be materially important in deciding whether to purchase Zantac.

125.   Plaintiff and the Class were harmed and suffered ascertainable loss and actual damages as a result of Defendants' misrepresentations and omissions relating to Zantac because they would not have purchased Zantac, or paid less for Zantac, had they known the truth about the product as set forth herein.

126.   Defendant's conduct proximately caused injuries to Plaintiff and the Class. Plaintiff and the Class are entitled to actual damages, statutory damages, treble damages, equitable relief, injunctive relief, attorneys' fees, costs and other appropriate relief under the NYDAPA, in an amount to be proven at trial.

127.   Plaintiff and the Class also seek a supplemental civil penalty for elderly persons pursuant to N.Y. Gen. Bus. Law §349-c.

## COUNT II
### Damages for Violations of New York False Advertising Act
### N.Y. Gen. Bus. Law § 350
### (On Behalf of Plaintiff and the Class)

128.   Plaintiff hereby incorporates by reference all preceding allegations.

129.   Defendant engaged in consumer-oriented commercial conduct by selling and advertising Zantac to Plaintiff and the Class.

130.   Plaintiff and the Class are consumers who purchased Zantac Products.

131.   Defendants' conduct occurred in "the conduct of business, trade or commerce" within the meaning of the New York False Advertising Act ("NYFAA"), N.Y. Gen. Bus. Law § 350.

132.   The NYFAA prohibits "[f]alse advertising in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 350. False advertising includes "advertising, … if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material." N.Y. Gen. Bus. Law § 350-a.

133.   Defendants caused to be made or disseminated throughout New York, through advertising, marketing, and other publications, statements and omissions that were untrue or misleading, that Defendants knew, or through the exercise of reasonable care should have known, were untrue and misleading to Plaintiff and the Class, as described herein.

134.   Defendants misrepresented and omitted material facts regarding Zantac to Plaintiff and the Class in advertising and other forms of communication, including, without limitation, standard and uniform material provided with the drug's packaging, that led consumers to believe that Zantac had no significant defects and was safe to consume, and would not put them at increased risk of cancer, when, in fact, Zantac was defective as set forth herein. Accordingly, Defendants engaged in unfair and deceptive acts or practices.

32

135.    Defendants' acts and omissions were likely to, and did in fact, mislead reasonable consumers into purchasing Defendants' products. Defendants' deceptive acts are material because they concern an essential feature of the Zantac Products – the ability to safely treat a variety of gastrointestinal disorders by reducing the amount of acid that consumers' stomachs produce.

136.    Defendants' practices, acts, policies, and course of conduct, including its omissions and failure to inform the FDA and consumers about the NDMA risk, as described herein, were intended to induce, and did induce, Plaintiff and the Class to purchase the Zantac Products.

137.    Defendants knowingly misrepresented the Zantac Products as fit to be used for the purpose for which they were intended, when, in fact, Defendants knew that the Zantac Products were defective, unsafe, and not as advertised. Indeed, Defendants misrepresented the Zantac Products by not properly labeling Zantac to inform customers that Zantac contains NDMA in levels that far exceed the FDA's recommended daily intake of NDMA in pharmaceuticals, or that NDMA is a probable human carcinogen that will increase Plaintiff and Class members' risk of getting cancer.

138.    Plaintiff and the Class reasonably relied on Defendants' misrepresentations and omissions of material facts in purchasing Zantac.

139.   Defendants sold the Zantac Products knowingly concealing the fact that they contained the NDMA/cancer risk alleged herein, including, without limitation, knowingly or recklessly concealing that fact from the FDA.

140.   Plaintiff and the Class suffered injury, ascertainable loss, and actual economic damages as a result of Defendants' false advertising of Zantac.

141.   Plaintiff and the Class did not receive the benefit of their bargain.

142.   Defendant's conduct proximately caused injuries to Plaintiff and the Class. Had Plaintiff and the Class known about the defective nature of Zantac, they would have paid less for Zantac or not purchased it at all, and would have purchased one of other available medications, and would not have paid for Zantac that they have not and will not use.

143.   Plaintiff and the Class are entitled to actual damages and/or equitable relief, injunctive relief, attorneys' fees, costs, and other appropriate relief under the NYFAA, in an amount to be proven at trial.

144.   Plaintiff and the Class also seek all available statutory damages and treble damages up to $10,000 pursuant to N.Y. Gen. Bus. Law § 350-e, because Defendants' unlawful conduct was committed willfully and knowingly.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, requests the Court to enter judgment on her behalf and on behalf of the Class as follows:

1.    Certifying the Class and designating Plaintiff as Class Representative and her counsel as Class Counsel;

2.    Issuing appropriate notice to the Class at Defendants' expense;

3.    Awarding restitutionary, compensatory, exemplary, statutory, punitive, and all other available damages, including interest, in an amount to be proven at trial;

4.    Awarding any and all remedies provided by pursuant to the New York General Business Laws alleged herein;

5.    Awarding pre-judgment and post-judgment interest;

6.    Awarding attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

7.    Awarding all further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury of any and all issues in this action so triable.

Dated: November 8, 2019                    Respectfully submitted,


                                   s/ Jacob M. Polakoff
                                   Jacob M. Polakoff
                                   Shanon J. Carson
                                   Jeff Osterwise
                                   Amanda Trask
                                   BERGER MONTAGUE PC
                                   1818 Market Street, Suite 3600
                                   Philadelphia, PA 19103
                                   Telephone: (215) 875-3000
                                   Facsimile: (215) 875-4604
                                   jpolakoff@bm.net

scarson@bm.net
josterwise@bm.net
atrask@bm.net

BERGER MONTAGUE PC
E. Michelle Drake
John G. Albanese
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5997
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

SAUDER SCHELKOPF LLC
Joseph G. Sauder
Matthew D. Schelkopf
Lori G. Kier
555 Lancaster Avenue
Berwyn, PA  19312
Telephone: (610) 200-0580
Facsimile: (610) 421-1326
jgs@sstriallawyers.com
mds@sstriallawyers.com
lgk@sstriallawyers.com


*Counsel for Plaintiff and the proposed Class*